# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

COMMONWEALTH OF MASSACHUSETTS,
STATE OF COLORADO, STATE OF
CONNECTICUT, STATE OF DELAWARE,
DISTRICT OF COLUMBIA, STATE OF
ILLINOIS, STATE OF MARYLAND, STATE
OF MICHIGAN, STATE OF MINNESOTA,
STATE OF NEVADA, STATE OF NEW
JERSEY, STATE OF NEW MEXICO, STATE
OF OREGON, COMMONWEALTH OF
PENNSYLVANIA, STATE OF RHODE
ISLAND, STATE OF VERMONT,
COMMONWEALTH OF VIRGINIA, and
STATE OF WISCONSIN,

*Plaintiffs*,

v.

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY; CHAD F. WOLF, in
his official capacity as Acting Secretary of
Homeland Security; U.S. IMMIGRATION AND
CUSTOMS ENFORCEMENT; and MATTHEW
T. ALBENCE, in his official capacity as Acting
Director of U.S. Immigration and Customs
Enforcement,

*Defendants*.

Civil Action No. 20-11311

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

## INTRODUCTION

1.      Plaintiffs Commonwealth of Massachusetts, State of Colorado, State of

Connecticut, State of Delaware, District of Columbia, State of Illinois, State of Maryland, State

of Michigan, State of Minnesota, State of Nevada, State of New Jersey, State of New Mexico,

State of Oregon, Commonwealth of Pennsylvania, State of Rhode Island, State of Vermont,

Commonwealth of Virginia, and State of Wisconsin (collectively, "the Plaintiff States" or "the States") bring this action to challenge the federal government's cruel, abrupt, and unlawful action to expel international students or force campuses to be less safe amidst the SARS-CoV-2 pandemic that has wrought death and disruption across the United States.

2.      Our States' colleges and universities—incubators of the very advancements in science and public health that we hope will conquer the pandemic—have not been spared its effects. As millions of SARS-CoV-2 infections have spread across the country and more than 137,000 people have suffered and died from COVID-19 disease as a result, our institutions of higher education have had to overhaul their operations to keep students, faculty, and staff safe while continuing their vital missions.

3.      These institutions' efforts are consistent with the continuing recognition of an ongoing public health emergency by the federal government and by all of the Plaintiff States, and with carefully designed guidance and directives by the States to control the spread of the virus given the specific conditions in each state and at each school.

4.      Recognizing that indoor gatherings pose particular risk for transmitting the highly contagious—and sometimes deadly—virus, colleges and universities have eliminated some or all in-person classes.  A blanket approach to holding in-person classes, no matter the current, local public health risks, endangers not only students, faculty, and staff, but also their household members and our communities more broadly.

5.      In light of the need to limit or eliminate in-person classes during the pandemic, on March 13, 2020, U.S. Immigration and Customs Enforcement (ICE), a division of the Department of Homeland Security (DHS), issued guidance advising students and educational institutions that, "[g]iven the extraordinary nature of the COVID-19 emergency," exemptions

would be granted "for the duration of the emergency" to allow international students attending

our colleges and universities on certain nonimmigrant student visas ("F-1" and "M-1" visas) to

take online classes to fulfill the course of study required by their visas (the "March 13

Guidance").[1] At the time of the March 13 Guidance, there were known to have been a total of

4,575 COVID-19 cases and 55 related deaths in the United States.[2]

6.     Without warning, on July 6, 2020—a date on which the country recorded 47,375

new positive COVID-19 tests in a single day, and by which date a total of 122,915 known deaths

had occurred in the United States, with hundreds more occurring every day[3]—ICE announced

through a "Broadcast Message" a new directive that international students can no longer live in

the United States and take their classes online (the "July 6 Directive" or "Directive").

7.     This abrupt change came after colleges and universities had final or near-final

plans already in place for fall 2020. Because of the months-long efforts required to coordinate

these plans, institutions were forced to rely on the March 13 Guidance announced "for the

duration of the emergency" in making these preparations, and the vast majority have opted for

continued use of online learning to ensure the health and safety of students, faculty, staff, and the

public at large.

8.     The July 6 Directive upended these carefully developed plans by requiring

students who are not taking a sufficient number of in-person classes to "depart the country or

---

[1] U.S. Immigration and Customs Enforcement, Homeland Security Investigations, National Security Investigations Division, Student and Exchange Visitor Program, COVID-19: Guidance for SEVP Stakeholders, at 1-2 (Mar. 13, 2020), https://www.ice.gov/sites/default/files/documents/Document/2020/Coronavirus%20Guidance_3.13.20.pdf.
[2] The COVID Tracking Project, U.S. Historical Data, https://covidtracking.com/data/us-daily.
[3] *Id.*

take other measures, such as transferring to a school with in-person instruction to remain in lawful status or potentially face immigration consequences including, but not limited to, the initiation of removal proceedings."[4] The Directive further demanded that educational institutions advise the federal government within 9 days—by July 15, 2020—whether they intend to offer only remote courses in the fall semester, and to certify within 20 days—by August 4, 2020—that each individual student taking in-person classes meets particularized requirements for in-person learning or a "hybrid" of in-person and online learning.[5]

9.     ICE offered no rationale for this abrupt reversal of the March 13 Guidance, which had explicitly allowed exemptions to in-person learning requirements "for the duration of the emergency" our States and schools continue to face. It failed to consider the health and safety of our students, faculty, staff, and the untold other residents of our States with whom they interact; it failed to consider the tremendous costs and burden this abrupt reversal would impose on our institutions of higher learning; and it failed to consider that, for many of our international students, remote learning in the countries and communities from which they come would impede their studies or be simply impossible. It is the essence of arbitrary and capricious to withdraw, without explanation, a commonsense measure to manage the pandemic currently engulfing our country.

10.     This reversal leaves colleges and universities with an agonizing dilemma. To ensure all of their students can remain in the United States to continue their courses of study, they must scramble to offer sufficient in-person classes in myriad subjects for hundreds of thousands of international students, mere weeks before the semester starts, and without regard

---

[4] Student and Exchange Visitor Program, Broadcast Message: COVID-19 and Fall 2020, at 1 (July 6, 2020), https://www.ice.gov/doclib/sevis/pdf/bcm2007-01.pdf.
[5] *Id.* at 2.

for the public health impact of doing so. The alternative is to lose significant numbers of international students from their campuses, who will be forced to leave the country to participate remotely insofar as they are able, transfer to another school offering sufficient in-person classes, or disenroll from school altogether.

11.     Either choice will inflict harm. In-person instruction offered only for the purposes of meeting this arbitrary Directive risks sacrificing the health and safety of students, faculty, and staff—and, indeed, our States more generally. Losing the presence—and in many cases the enrollment—of international students would result in the loss of invaluable perspectives and contributions by these students, hundreds of millions of dollars in foregone tuition as well as fees for housing and other services, and hundreds of billions of dollars in revenue for our States' economies.

12.     ICE's reversal also imposes an insuperable burden on our colleges and universities. These institutions now must certify by August 4, 2020, for each and every international student, that the students' respective class schedules meet the federal requirement for sufficient in-person learning. These same institutions have, for months, been devising detailed, multifaceted plans to ensure the safety and well-being of our students, faculty, and staff, while also preserving learning opportunities for students, all while dealing with the uncertainty of the pandemic's course. Now, with insufficient notice, zero explanation, and severely depleted resources, colleges and universities are forced to readjust all of those plans to account for whether every single international student, in every single program, will have sufficient in-person learning opportunities to maintain their visa status in the United States—a determination they must make before many students have registered for a single class, while many faculty and

staff are absent from campus due to the pandemic or on leave for the summer, and while the

pandemic's course this summer and autumn remains worrisome and unclear.

13.     ICE's reversal is senseless and cruel to our universities and students. It also

violates the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq*., by failing to offer any reason

for the dramatic policy reversal, neglecting to consider the myriad ways in which the colleges,

universities, and students relied on the previous policy, disregarding our country's ongoing—

indeed worsening—public health emergency, and imposing an effective date that makes

compliance all but impossible. Thus issued wholly without warning or opportunity for notice and

comment from the myriad affected individuals and entities, the July 6 Directive is also

procedurally invalid. This Court should therefore stay the effective date of the Directive pending

judicial review; grant the Plaintiff States declaratory and injunctive relief from the Directive on a

preliminary and permanent basis; vacate and set aside the Directive; and award the Plaintiff

States such other relief as is requested herein.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331

and may enter declaratory, injunctive, and other relief under 28 U.S.C § 2201(a) and 5 U.S.C.

§§ 702, 705-706.

15.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and

1391(e)(1). Defendants are United States agencies or officers sued in their official capacities.

The Commonwealth of Massachusetts is a resident of this judicial district, and a substantial part

of the events or omissions giving rise to this complaint occurred within the district.

## PARTIES

16.     Plaintiff Commonwealth of Massachusetts, represented by and through its

Attorney General, is a sovereign state of the United States of America. This action is brought on

behalf of the Commonwealth by Attorney General Maura Healey, who has both statutory and

common-law authority and responsibility to represent the public interest for the people of

Massachusetts in litigation, as well as to represent the Commonwealth, state agencies, and

officials in litigation. Mass. Gen. Laws ch. 12, § 3; *Feeney v. Commonwealth*, 366 N.E.2d 1262,

1266-67 (Mass. 1977).

17.     Plaintiff State of Colorado is a sovereign state of the United States of America.

This action is brought on behalf of the State of Colorado by Attorney General Phillip J. Weiser,

who is the chief legal counsel of the State of Colorado, empowered to prosecute and defend all

actions in which the state is a party. Colo. Rev. Stat. § 24-31-101(1)(a).

18.     Plaintiff State of Connecticut, represented by and through its Attorney General,

William Tong, is a sovereign state of the United States of America. The Attorney General brings

this action as the state's chief civil legal officer under Conn. Gen. Stat. § 3-124 *et seq.*

19.     Plaintiff State of Delaware is a sovereign state of the United States of America.

This action is brought on behalf of the State of Delaware by Attorney General Kathleen

Jennings, the "chief law officer of the State." *Darling Apartment Co. v. Springer*, 22 A.2d 397,

403 (Del. 1941). General Jennings also brings this action on behalf of the State of Delaware

pursuant to her statutory authority. Del. Code Ann. tit. 29, § 2504.

20.     Plaintiff District of Columbia is a sovereign municipal corporation organized

under the Constitution of the United States. It is empowered to sue and be sued, and it is the local

government for the territory constituting the permanent seat of the federal government. The

District is represented by and through its chief legal officer, the Attorney General for the District of Columbia, Karl A. Racine. The Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District and is responsible for upholding the public interest. D.C. Code § 1-301.81.

21.      Plaintiff State of Illinois is a sovereign state of the United States of America. The State of Illinois is represented by Attorney General Kwame Raoul as its chief law enforcement officer. Ill. Constit. Art. V, § 15. Attorney General Raoul has broad statutory and common law authority to act in the interests of the State of Illinois and its citizens in matters of public concern, health, and welfare. 15 ILCS 205/4.

22.      Plaintiff State of Maryland is a sovereign state of the United States of America. Maryland is represented by and through its chief legal officer, Attorney General Brian E. Frosh. Under the Constitution of Maryland, and as directed by the Maryland General Assembly, the Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Maryland residents. Md. Const. art. V, § 3(a)(2); 2017 Md. Laws, J. Res. 1.

23.      Plaintiff State of Michigan is a sovereign state of the United States of America. This action is brought on behalf of the State by Attorney General Dana Nessel, the State of Michigan's chief law enforcement officer, pursuant to her statutory authority. Mich. Comp. Laws § 14.28.

24.      Plaintiff State of Minnesota is a sovereign state of the United States of America. This action is brought on behalf of the State by Attorney General Keith Ellison, the chief law officer of the State. Minn. Stat. § 8.01.

25.     Plaintiff State of Nevada, represented by and through Attorney General Aaron D. Ford, is a sovereign state within the United States of America. The Attorney General is the chief law enforcement officer of the State of Nevada and is authorized to pursue this action under Nev. Rev. Stat. 228.110 and Nev. Rev. Stat. 228.170.

26.     Plaintiff State of New Jersey is a sovereign state of the United States of America. This action is being brought on behalf of the State by Attorney General Gurbir S. Grewal, the State's chief legal officer. N.J. Stat. Ann. § 52:17A-4(e), (g).

27.     Plaintiff State of New Mexico is a sovereign state of the United States of America. New Mexico is represented by its Attorney General, Hector Balderas, who is authorized to assert the state's interests in state and federal courts.

28.     Plaintiff State of Oregon, acting by and through the Attorney General of Oregon, Ellen F. Rosenblum, is a sovereign state of the United States of America. The Attorney General is the chief law officer of Oregon and is empowered to bring this action on behalf of the State of Oregon, the Governor, and the affected state agencies under Or. Rev. Stat. §§ 180.060, 180.210, and 180.220.

29.     Plaintiff Commonwealth of Pennsylvania is a sovereign state of the United States of America. This action is brought on behalf of the Commonwealth by Attorney General Josh Shapiro, the "chief law officer of the Commonwealth." Pa. Const. art. IV, § 4.1. Attorney General Shapiro brings this action on behalf of the Commonwealth pursuant to his statutory authority. 71 Pa. Stat. § 732-204.

30.     Plaintiff State of Rhode Island is a sovereign state of the United States of America. This action is brought on behalf of the State by Attorney General Peter F. Neronha, the State's chief legal officer. R.I.G.L. § 42-9-5; R.I. Const., art. IX § 12.

31.     Plaintiff State of Vermont is a sovereign state of the United States of America. This action is brought on behalf of the State by Attorney General Thomas J. Donovan, Jr., the State's chief legal officer. *See* Vt. Stat. Ann. tit. 3, §§ 152, 157.

32.     Plaintiff the Commonwealth of Virginia is a sovereign state of the United States of America. This action is brought on behalf of the Commonwealth by Attorney General Mark R. Herring. As chief executive officer of the Department of Law, General Herring performs all legal services in civil matters for the Commonwealth. Va. Const. art. V, § 15; Va. Code Ann. §§ 2.2-500, 2.2-507.

33.     Plaintiff State of Wisconsin is a sovereign state of the United States of America. This action is brought on behalf of the State of Wisconsin by Attorney General Joshua L. Kaul pursuant to his authority under Wis. Stat. § 165.015(6). Attorney General Kaul brings this action at the request of Governor Tony S. Evers pursuant to Wis. Stat. § 165.25(1m).

34.     The Plaintiff States are aggrieved and have standing to bring this action because Defendants' actions pose immediate and irreparable injuries to the Plaintiff States' proprietary, sovereign, and quasi-sovereign interests.

35.     Defendant United States Department of Homeland Security is an agency of the United States federal government. DHS implements and enforces the Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1101 *et seq.*

36.     Defendant U.S. Immigration and Customs Enforcement is a division of DHS.

37.     Defendant Chad F. Wolf is the Acting Secretary of Homeland Security. He is sued in his official capacity.

38.     Defendant Matthew T. Albence is Acting Director of ICE. He is sued in his official capacity.

## FACTS

### Our National Emergency

39.     The COVID-19 pandemic's relentless spread began in late 2019, and the first

United States case was confirmed on January 20, 2020. On March 11, 2020, the outbreak of

COVID-19 was characterized as a pandemic by the World Health Organization. By March 13,

2020, 45 states—including all the Plaintiff States—had declared states of emergency due to

escalating case counts, hospitalizations, and deaths worldwide and in the United States. By early

April, all 50 states had declared a state of emergency.

40.     On March 13, 2020, President Donald J. Trump announced a national emergency.

41.     COVID-19 is a highly contagious, and sometimes fatal, respiratory disease. The

disease has an extreme risk of person-to-person transmission via respiratory droplets and in close

contact settings has also been demonstrated to be transmitted by aerosols. Although symptoms of

the disease may include fever, cough, and shortness of breath, many individuals who contract

COVID-19 are asymptomatic and indeed are unaware of their infection and risk of infecting

others. Even those who ultimately show symptoms may not do so until days after exposure to the

virus, during which time they may be infectious to others. It is generally thought that people with

symptoms are likely able to actively spread virus for approximately 48 hours before their

symptoms occur. The disease tends to have more severe outcomes for individuals aged 60 and

over and individuals with underlying health conditions, but has had lethal effects across

demographic groups. The risk of transmission is of concern for indoor gatherings of any size, but

particularly for large, densely populated indoor gatherings. Such gatherings can facilitate the

spread of infection of COVID-19 not only to the gathered individuals and to those with whom

they come into close contact, but to others in their communities.

42.     Federal, state, and local governments have issued guidance and directives to mitigate the spread of COVID-19. These measures have included mandating the shutdown of physical workplaces, advising residents to stay home, and limiting the size of gatherings. Those state governments that have allowed workplaces and sectors to reopen have required compliance with a variety of measures to mitigate the spread of COVID-19, including limiting the occupancy of buildings and the number of individuals that can gather indoors, and providing detailed protocols for social distancing, hygiene, staffing, cleaning, and disinfecting.

43.     The Centers for Disease Control and Prevention has issued guidance encouraging virtual learning to reduce risks at colleges at universities.[6] And most of the Plaintiff States have issued guidance or directives specific to the operations of colleges and universities to help schools navigate how to continue their educational missions and operations while also protecting students, faculty, staff, and the public health.

44.     Because of the particular risk of indoor infection of COVID-19, and in order to comply with state and local limitations on and protocols for indoor gatherings, colleges and universities across the country suspended in-person instruction for the spring semester.

**Defendants' Initial Response to the Pandemic**

45.     On March 13, 2020, ICE responded to these pandemic conditions and their obvious impact on in-person learning by issuing temporary exemptions "for the duration of the emergency" to the existing requirements that international students on F-1 and M-1 visas attend most or all of their classes in person.

---

[6] Centers for Disease Control and Prevention, Coronavirus Disease 2019 (COVID-19), Considerations for Institutions of Higher Education, https://www.cdc.gov/coronavirus/2019-ncov/community/colleges-universities/considerations.html

46.     As a condition of obtaining and maintaining an F-1 or M-1 visa to study in the United States, an international student must be "a bona fide student qualified to pursue a full course of study and who seeks to enter the United States temporarily and solely for the purpose of pursuing such a course of study[,]" at an institution that "shall have agreed to report to the Attorney General" regarding students' attendance. 8 U.S.C. § 1101(a)(15)(F).

47.     Institutions of higher education are required to report to the Attorney General information regarding their international students, including whether the students are "maintaining status as a full-time student." 8 U.S.C. § 1372(c)(1)(C). DHS maintains this information in the Student and Exchange Visitor Information System, or SEVIS.

48.     Students are admitted "for duration of status," defined as "the time during which [the] student is pursuing a full course of study" or "engaging in authorized practical training following completion of studies[.]" 8 C.F.R. § 214.2(f)(5)(i). Students "may be admitted for a period up to 30 days before" they "need to be in attendance for required activities." *Id.* § 214.2(f)(5)(i) (30 days); *id.* § 214.2(f)(7)(ii) (defining "report date"). "The student is considered to be maintaining status if he or she is making normal progress toward completing a course of study[,]" *id.* § 214.2(f)(5)(i), and stays in status "during the annual (or summer) vacation if the student is eligible and intends to register for the next term," *id.* § 214.2(f)(5)(iii). *See also id.* § 214.2.(f)(6)(iii)(B) (authorizing reduced course loads for up to 12 months based on substantiated medical conditions, among other grounds).

49.     The regulatory definition of "full course of study" limits the amount of "on-line" or "distance education" courses "not requir[ing] the student's physical attendance for classes, examination or other purposes integral to completion of the class" that can count toward a full course of study. 8 C.F.R. § 214.2(f)(6)(G). This limit is "no more than the equivalent of one class

or three credits per session, term, semester, trimester, or quarter." *Id.* An "on-line or distance education course" is defined as one "offered principally through the use of television, audio, or computer transmission." *Id.* For both F-1 students at language study programs and students with M-1 visas to study at vocational schools, "no on-line or distance education classes may be considered to count toward a student's full course of study requirement." *Id.* (language study programs); *id.* § 214.2(m)(9)(v) (vocational schools).

50.     In addition to allowing students to study, F-1 and M-1 visas permit students to accept certain types of employment. 8 C.F.R. §§ 214.2(f)(9), f(10), & (m)(13)-(14). Students on F-1 visas may engage in on-campus employment, subject to some restrictions. 8 C.F.R. § 214.2(f)(9)(i). After their first year, F-1 students can engage in both on-campus employment and off-campus employment through curricular practical training (CPT) and optional practice training (OPT). *Id.* § 214.2(f)(10). After completion of their academic program, subject to certain restrictions, F-1 students can work on OPT for up to one year with the possibility of renewal in some circumstances. *Id.* § 214.2(f)(10)(ii). M-1 students may engage in practical training after they have completed their studies, with some restrictions. *Id.* § 214.2(m)(14).

51.     Recognizing "the extraordinary nature of the COVID-19 emergency," on March 13, 2020, ICE's Student and Exchange Visitor Program (SEVP) announced it would "allow F-1 and/or M-1 students to temporarily count online classes towards a full course of study in excess of the limits stated in *Id.* § 214.2(f)(6)(i)(G) and (m)(9)(v)."[7] ICE required educational institutions to "notify SEVP of COVID-19 procedural changes within 10 business days." *Id.*

---

[7] U.S. Immigration and Customs Enforcement, Homeland Security Investigations, National Security Investigations Division, Student and Exchange Visitor Program, COVID-19: Guidance for SEVP Stakeholders, at 1 (Mar. 13, 2020), https://www.ice.gov/sites/default/files/documents/Document/2020/Coronavirus%20Guidance_3.13.20.pdf.

52.    ICE stated that these exemptions would be "in effect for the duration of the emergency," although a disclaimer at the end of the guidance noted that "[d]ue to the fluid nature of this difficult situation, this guidance may be subject to change."

53.    In additional guidance provided via Frequently Asked Questions, ICE further advised that, if schools were unable to offer all courses due to inability to deliver via online methods, course of study requirements could be waived via the school's procedural change documents. Frequently Asked Questions for SEVP Stakeholders About COVID-19, at 8 (version last updated May 12, 2020), https://tinyurl.com/y87ht4ye. Moreover, "F and M students unable to participate in online or other alternative instruction requirements due to the lack of available technology resources [were to] notify their" schools, and schools were advised that they "may keep these student records Active in SEVIS as long as the student intends to resume their course of study when in-person classes resume." *Id.* at 5.

54.    As of ICE's March 13, 2020 action, the United States had confirmed 4,575 COVID-19 cases anywhere across the country, and had recorded a total of 55 deaths.[8]

**States', Schools', and Students' Reliance on ICE's Action in Planning for Fall 2020**

55.    Schools in the Plaintiff States[9] substantially stopped in-person instruction and transitioned to remote learning in March 2020. Pursuant to public health and safety information, guidance, and mandates, schools moved courses online and students out of on-campus housing. During that time, as required by the March 13 Guidance, schools in the Plaintiff States submitted procedural changes to SEVP.

---

[8] The COVID Tracking Project, U.S. Historical Data, https://covidtracking.com/data/us-daily.
[9] Throughout this complaint, references to "colleges," "universities," "schools," and the like refer to both public and private institutions of higher education, except where context dictates otherwise.

56.     Soon thereafter, schools shifted to planning for the fall of 2020. College and university administrators and others undertook time- and resource-intensive planning over the course of several weeks and months, carefully weighing known and uncertain facts and circumstances and engaging in deliberative decision-making. These schools conducted outreach to interested and expert parties, such as public health and medical experts, to assist them in considering their options and developing and implementing plans. They also surveyed stakeholders, such as students, faculty, and staff. This planning involved both individualized campus-based assessments and system-wide coordination and decision-making. Colleges and universities invested extensive institutional resources in developing plans for the fall to balance the health and safety of students, faculty, staff, and the broader community with their commitment to providing high-quality education to their students. In many cases, colleges and universities invested significant resources specifically in developing and improving their capabilities for providing online learning to their students.

57.     Colleges and universities in the Plaintiff States have announced or are imminently announcing their plans for the 2020-2021 academic year. Many intend to offer a carefully balanced hybrid of in-person and online instruction, favoring in-person courses for programs that require hands-on learning. As part of these plans, schools have set rules about students' return to campus. In some cases, for example, only first-years or seniors will return; in other cases, universities will permit vulnerable students—such as those with home environments that are unsafe or not conducive to learning—to return.

58.     Many of these plans are designed to be flexible, so that students can shift back and forth between in-person and remote learning depending on the community trends of the

virus, outbreaks on campus, and specific factors for individual students such as illness, exposure to COVID-19, or compromised immune systems.

59.     Given the extraordinary time, effort, and coordination required to develop and implement appropriate public health and safety measures on their campuses, schools were left with no option but to rely on the March 13 Guidance in preparing for classes to resume in the fall. Early preparation was particularly necessary so that students, faculty, and staff could make their plans for travel, housing, work, and study.

60.     Students, faculty, and staff have accordingly been making such plans—relying on the announcements their colleges and universities have made—including securing leases, booking plane tickets, enrolling their children in schools, and seeking or planning for employment for themselves and their spouses.

### ICE Reverses Course

61.     On July 6, 2020, ICE abruptly reversed course. With no warning of any kind, let alone giving adequate notice and an opportunity to comment, ICE largely rescinded the pandemic exemptions to the in-person class requirements for the semester slated to begin in mere weeks, requiring all schools to report within 9 days if they would be conducting all of their classes remotely in the fall, and requiring schools to certify by August 4, 2020, for each individual F-1 and M-1 student, that the student's academic program would meet new requirements for the level of in-person instruction deemed adequate by ICE.

62.     The July 6 Directive provided that F-1 and M-1 students "attending schools operating entirely online may ***not*** take a full online course load and remain in the United

States."[10] Carrying out this reversal, "[t]he U.S. Department of State will not issue visas to students enrolled in schools and/or programs that are fully online for the fall semester nor will U.S. Customs and Border Protection permit these students to enter the United States." *Id.* Accordingly, ICE directed, "Active students currently in the United States enrolled in such programs must depart the country or take other measures, such as transferring to a school with in-person instruction to remain in lawful status or potentially face immigration consequences including, but not limited to, the initiation of removal proceedings." *Id.*

63.     The July 6 Directive entirely rescinded the March 13 Guidance's exemptions with respect to students on an M-1 visa pursuing vocational education and F-1 students in English language training programs, "who are not permitted to enroll in any online courses." *Id.* (citing 8 C.F.R. § 214.2(f)(6)(i)(G); 8 C.F.R. 214.2(m)(9)(v)).

64.     For schools "adopting a hybrid model," which ICE defined to mean "a mixture of online and in person classes," ICE newly required schools to certify, for each F-1 student, "within 21 business days of publication of this Broadcast Message (by August 4, 2020.[sic])," that the student's particular "program is not entirely online, that the student is not taking an entirely online course load for the fall 2020 semester, and that the student is taking the minimum number of online classes required to make normal progress in their degree program."[11]

65.     Moreover, "[o]nly students enrolled at a school that is ***only*** offering online coursework can engage in remote learning from their home country."[12]

---

[10] Student and Exchange Visitor Program, Broadcast Message: COVID-19 and Fall 2020, at 1 (July 6, 2020), https://www.ice.gov/doclib/sevis/pdf/bcm2007-01.pdf (emphasis in original).
[11] *Id.* at 1-2.
[12] *Id.* at 2 (emphasis added).

66.     In other words, students have only three choices: (1) enroll in a program that only offers online classes and stay outside of the United States; (2) enroll in a program that offers a hybrid model, and make sure to take "the minimum number of online classes required to make normal progress" in the degree program; or (3) enroll in a fully in-person program. Schools must work to accommodate each individual international student to ensure that one of these options is possible and acceptable—and that it does not change over the course of the semester—or risk losing the student altogether.

67.     The July 6 Directive's dramatic reversal of course was issued without explanation. The Directive referred to the "need to resume the carefully balanced protections implemented by federal regulations,"[13] but did not give any reason why this "need" arose amidst the on-going emergency that was the basis for its March 13, 2020 Guidance "for the duration of the emergency," nor explain how the unspecified "balance[]" had shifted.

68.     On July 7, ICE issued a document entitled "Frequently Asked Questions for SEVP Stakeholders about Guidance for the Fall 2020 Semester" ("FAQ").[14] In purporting to explain the reasons for the new Directive after it was issued, this FAQ asserts that "DHS is seeking to maximize flexibility for students to continue their studies, while minimizing the risk of transmission of COVID-19 by not admitting students into the country who do not need to be present to attend classes in-person[,]" and that the July 6 Directive "provided the best options for flexibility for nonimmigrant students to continue education with health risks associated with international travel at this time."[15] Like the July 6 Directive, this FAQ, too, fails to explain why a reversal of the March 13 Guidance was warranted at this time, as the pandemic continues to

---

[13] *Id.* at 1.
[14] https://www.ice.gov/doclib/sevis/pdf/sevisFall2020_FAQ.pdf.
[15] *Id.* at 2, 3.

ravage communities across the country. Moreover, this purported explanation has no logical connection to the Directive's requirement that students currently present in the United States must depart—and assume the "health risks associated with international travel at this time"—if their schools are currently offering only online instruction due to the pandemic.

69.     The July 6 Directive fails to address the substantial reliance interests of students, colleges, and universities on the March 13 Guidance, the roadmap for planning that guidance provided to students, colleges, and universities, and the flexibility it allowed.

70.     The July 6 Directive also fails to consider the harm to international students and their families whose lives will be upended; the lost revenue to colleges and universities if foreign students are forced to stay away; the enormous administrative burden on schools to rethink carefully calibrated fall semester plans and to make individual certifications for each individual international student in a matter of weeks, at a time when many students will not yet have even chosen their courses; the individual, community, and public health impact of schools being forced to offer additional and superfluous in-person learning in order to ensure the status of its international students; the harm to the university community of losing the perspectives, skills, and talents of so many international students; and the harm to the economy and society if international students are forced to leave.

71.     And the July 6 Directive also fails to explain the impossibly short timeline for implementation of its requirements, leaving only nine days for colleges and universities to advise the federal government if they will be fully online for the fall 2020 semester and then only 20 days later to certify that each individual student will meet the requirements for hybrid or in-person learning.

**The July 6 Directive's Irreparable Harms to Plaintiff States, Schools, and Students**

72.     The Directive will cause immediate and irreparable harm to the States as well as to their residents, schools, and students.

73.     Collectively, the Plaintiff States are home to a combined 1,124 colleges and universities,[16] hosting approximately 373,304 international students in 2019, who contributed an estimated $14,502,646,811 to our States'—and the country's—economy that year.[17]

74.     The Plaintiff States' own 487 public colleges and universities[18] host tens of thousands of international students[19] and contribute trillions of dollars to the economy each year. Of the twenty-five universities and colleges listed by the Institute of International Education as leading host institutions for international students in 2019, one-fifth are public colleges and universities located in Plaintiff States, hosting a combined 45,860 international students.[20]

75.     Each Plaintiff State funds, supports, and/or administers its own public colleges and universities. The July 6 Directive directly regulates these public colleges and universities, will harm their operations, will cost them significant resources, and will make it more difficult for them to ensure the safety of their students, faculty, staff, and the untold additional number of state residents with whom members of our school communities live and otherwise interact daily. The Directive will also cause irreparable harm to the public health and the economy in the Plaintiff States.

---

[16] U.S. Department of Education National Center for Education Statistics College Navigator, https://nces.ed.gov/collegenavigator/.

[17] Institute of International Education Data By State Fact Sheet, https://www.iie.org/Research-and-Insights/Open-Doors/Fact-Sheets-and-Infographics/Data-by-State-Fact-Sheets (statistical information on international exchange in each state in 2019).

[18] U.S. Department of Education National Center for Education Statistics College Navigator, https://nces.ed.gov/collegenavigator/.

[19] Institute of International Education Leading Host Institutions, https://www.iie.org/Research-and-Insights/Open-Doors/Data/International-Students/Leading-Host-Institutions.

[20] Institute of International Education Leading Host Institutions, https://www.iie.org/Research-and-Insights/Open-Doors/Data/International-Students/Leading-Host-Institutions.

*Harm to Proprietary Interests*

76.     The July 6 Directive imposes immense and irreparable costs and burdens on Plaintiff States' public colleges and universities, costs and burdens ultimately borne by Plaintiff States.

77.     To retain all international students despite the Directive, our colleges and universities would have to substantially reevaluate the carefully calibrated plans they have developed for the fall semester and instead develop and implement new, complex, and costly accommodations to meet ICE's new requirements. If the schools do not, they will lose significant numbers of international students.

78.     Choosing to develop unanticipated fall 2020 plans that would expand the availability of in-person instruction poses enormous costs and burdens on schools, including staffing, COVID-19 testing, personal protective equipment sourcing, classroom space, class size assignments and reorganization, and instructor assignments.

79.     Choosing to retain plans that greatly limit in-person instruction or eliminate it altogether will leave our students defenseless against the July 6 Directive's requirement that they depart to study remotely in their home countries—insofar as they are able—or disenroll from school altogether. This would be a huge loss of financial, human, and cultural capital for our schools.

80.     Many students will be unable or unwilling to pursue their studies remotely from their home countries and will be forced to disenroll. These students would no longer pay tuition and housing, dining, and other fees at a time when colleges and universities are already faced with severe financial hardship. As a result, Plaintiff States' public institutions stand to lose tens of millions of dollars. This is a particularly acute loss because international students often pay

higher out-of-state tuition rates, which enhances public universities' ability to serve lower-income in-state students by reducing the amount of tuition they are required to pay. These international students would also likely no longer be able to work as employees on our campuses and help further important research goals for our institutions.

81.     Even where it is feasible for students to depart to their home countries to pursue online studies, our colleges and universities will still unexpectedly lose housing, dining, and other fees paid by these students; the students' in-person participation in research and other on-campus work that is not part of their course of study; and the students' unique in-person contributions to the fabric of college and university life.

82.     Indeed, the July 6 Directive will cause harm to schools' academic, extracurricular, and cultural communities. International students bring rich and diverse viewpoints, interests, and skillsets, which they share in classrooms, on-campus jobs, clubs, and other extracurricular activities, and social interactions with other students, faculty, and staff. If they are forced to disenroll or leave campus because of the July 6 Directive, schools and other students will lose their contributions.

83.     Our colleges and universities will also be forced to expend time and resources to make individualized determinations to certify students with F-1 and M-1 visas and re-issue I-20s for each student. These certifications require not only a determination of the particular forms of instruction offered by the schools in which each student is enrolled, but also a determination of each individual student's course load and the format in which such courses will be taught—the latter of which may not be information readily available to the school administration. In some cases, instructors may be given the option to include in-person components, and those decisions may not yet have been made. In other cases, students will not have registered for their courses

before SEVP's certification deadline, putting schools in the impossible position of having to certify students before they determine their courses.

84.     The 2020-21 academic year plans developed by schools, and their related operating budgets, of course do not account for the loss of revenue or any additional resources required to comply with the July 6 Directive. And the Directive's enormous impact comes as schools grapple with other financial challenges brought on by the COVID-19 pandemic.

*Harm to Sovereign Interests*

85.      The July 6 Directive will irreparably harm the Plaintiff States' sovereign interest in regulating their public colleges and universities, particularly with regard to public health and safety amidst the pandemic.

86.     Plaintiff States have issued guidance and mandates governing the reopening of colleges and universities. In Massachusetts, for example, the Department of Public Health and the COVID-19 Command Center issued mandatory workplace safety standards that apply to higher education institutions.[21] Massachusetts also provided guidance to cover two different phases of reopening, with guidance for a third phase still pending.[22] As part of the second phase, institutions of higher education must develop a written control plan outlining how each of their campuses will comply with the workplace safety mandates, including rules relating to social distancing, hygiene protocols, and cleaning and disinfecting.[23]

---

[21] https://www.mass.gov/info-details/reopening-mandatory-safety-standards-for-workplaces#overview-.

[22] https://www.mass.gov/info-details/reopening-higher-education.

[23] https://www.mass.gov/doc/higher-education-covid-19-control-plan-template/download.

87.     The July 6 Directive interferes with implementation of such state guidance and mandates, because it has the effect of coercing schools to consider greater use of in-person instruction, lest they lose their international students.

88.     The July 6 Directive also reduces the Plaintiff States' and their schools' flexibility in responding to changing conditions over the course of the pandemic. To the extent that pandemic conditions worsen, warranting further reduction or elimination of in-person instruction at schools not yet entirely online, the July 6 Directive will serve as a deterrent to making necessary changes as rapidly as possible and will impose additional costs—human, administrative, and pecuniary—in doing so.

89.     In public statements, the Administration has expressly acknowledged these coercive effects of the July 6 Directive and even indicated that the directive was actually intended to pressure schools into reopening, overriding the deliberative planning by Plaintiff States to ensure the health and safety of students, faculty, staff, and the broader community. The same day as the announcement of the administration's reversal, the President of the United States made repeated public statements expressing the view that schools must reopen in the fall:



The next day, Acting Deputy Secretary of Homeland Security Ken Cuccinelli underscored the connection between the July 6 Directive and the administration's evident preference in favor of reopening, stating that the July 6 Directive would "encourage schools to reopen."[24] Coercing

---

[24] Interview with Acting Deputy Secretary of Homeland Security Kenneth T. Cuccinelli, CNN (July 7, 2020), https://twitter.com/CNNPolitics/status/1280576267360886784. *See also, e.g.*,

schools into holding more in-person classes in the fall—regardless of the schools' assessment of the health and safety risks of doing so—harms the Plaintiff States' ability to regulate their institutions and protect the public.

*Harm to Quasi-Sovereign Interests*

90.     The July 6 Directive also threatens irreparable injury to the Plaintiff States' interests in the health and well-being, physical and economic, of our residents.

91.     Our States have an interest in preventing the physical harm to our residents—and to the public health system more generally—caused by the insidious spread of COVID-19. The July 6 Directive undermines this interest by encouraging the expansion of in-person classroom instruction beyond that which will best prevent and mitigate the spread of the disease, thus increasing the risk of infection to students, faculty, and staff; to the members of their households; and to the communities in which they live.

---

Donald J. Trump, Twitter (July 6, 2020) ("Corrupt Joe Biden and the Democrats don't want to open schools in the Fall for political reasons, not for health reasons! They think it will help them in November. Wrong, the people get it!"), https://twitter.com/realDonaldTrump/status/1280232979781111808; Donald J. Trump, Twitter (July 8, 2020) ("I disagree with @CDCgov on their very tough & expensive guidelines for opening schools. While they want them open, they are asking schools to do very impractical things. I will be meeting with them!!!"), https://twitter.com/realDonaldTrump/status/1280857657365200902; Donald J. Trump, Twitter (July 8, 2020) ("In Germany, Denmark, Norway, Sweden and many other countries, SCHOOLS ARE OPEN WITH NO PROBLEMS. The Dems think it would be bad for them politically if U.S. schools open before the November Election, but is important for the children & families. May cut off funding if not open!"), https://twitter.com/realDonaldTrump/status/1280232979781111808. Donald J. Trump, Twitter (July 10, 2020) ("Now that we have witnessed it on a large scale basis, and firsthand, Virtual Learning has proven to be TERRIBLE compared to In School, or On Campus, Learning. Not even close! Schools must be open in the Fall. If not open, why would the Federal Government give Funding? It won't!!!"), https://twitter.com/realDonaldTrump/status/1281554061972692994.

92.     Our States also have an interest in preventing the economic harm caused by the spread of COVID-19, as well as the more specific harm caused by discouraging or precluding thousands of international students from coming to and residing in our States. In addition to the significant loss of tuition dollars, the Plaintiff States' economies will suffer harms if international students are forced to disenroll from schools because of the July 6 Directive.

93.     Students working on campus as well as those with CPT and OPT authorization— opportunities made available to them because of their F-1 or M-1 status—contribute to our state economies by the thousands through their employment in fields such as science, technology, biotechnology, healthcare, business and finance, and education. Forcing F-1 and M-1 students to leave the country will diminish the chance that these students will have and accept the opportunity to make these contributions to our workforce, economy, and tax base.

94.     In addition to contributing as workers, international students rent apartments and houses from local landlords; purchase food from grocery stores and restaurants; and patronize our retail stores and entertainment and leisure sectors. During the 2018-2019 academic year, international students studying at U.S. colleges and universities contributed $41 billion and supported 458,290 jobs in the U.S. economy.[25] In Massachusetts alone, the 2019 economic impact of what was then approximately 71,000 international students was estimated as $3.2 billion.[26] A loss of international students would damage local economies at a time of already severe economic disruption caused by the pandemic.

---

[25] NAFSA Economic Value Statistics, https://www.nafsa.org/policy-and-advocacy/policy-resources/nafsa-international-student-economic-value-tool-v2.
[26] *Id.*

## CAUSES OF ACTION

### COUNT I

**Agency Action That Is Arbitrary, Capricious, an Abuse of Discretion,
or Otherwise Not in Accordance with Law
5 U.S.C. § 706(2)(A)**

95.     The Plaintiff States hereby incorporate by reference the foregoing paragraphs of this Complaint.

96.     Under the APA, a court "shall . . . hold unlawful and set aside agency action, findings and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

97.     The July 6 Directive is arbitrary, capricious, and an abuse of discretion because it:

a.   Failed to offer a reasoned explanation for its action;

b.   Failed to consider important aspects of the problem in reversing the March 13 Guidance, including:

i.   the need to protect public health and safety amidst the ongoing pandemic;

ii.   the reliance interests of schools and students across the country on that Guidance in forming their multifaceted response to the COVID-19 crisis and their plans for the impending fall 2020 semester; and

iii.   the July 6 Directive's harm to and extreme burdens on public and private educational institutions and students;

c.   Failed to consider, or outright disregarded, overwhelming evidence before the agency that the pandemic conditions that necessitated the March 13 Guidance have not abated; and

28

    d.   Required compliance on a timetable that does not afford the affected parties

         sufficient time to alter plans made in reliance on prior policy.

98.    The July 6 Directive is also arbitrary and capricious and not in accordance with the INA, because in the context of an escalating global pandemic, whether a particular student's instruction is provided entirely online bears no relationship to whether that student is a "bona fide" student within the meaning of 8 U.S.C. § 1101(a)(15)(F).

## COUNT II

### Without Observance of Procedure Required by Law
### 5 U.S.C. § 706(2)(D)

99.    Plaintiff States hereby incorporate by reference the foregoing paragraphs of this Complaint.

100.    Under the APA, a court "shall . . . hold unlawful and set aside agency action, findings and conclusions found to be . . . without observance of procedure required by law." 5 U.S.C. § 706(2)(A).

101.    Subject to enumerated exceptions not applicable here, federal agencies must complete the process of agency rulemaking before issuing a rule. *Id.* § 553(b).

102.    The July 6 Directive is a rule for purposes of the APA because it is an "agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." *Id.* § 551(4). The July 6 Directive indeed acknowledges that rulemaking is required to implement "the procedures and responsibilities" that it sets forth, where it provides that they will be published "in the near future as a Temporary Final Rule in the Federal Register."

103.    Defendant's issuance of the July 6 Directive without notice and comment rulemaking, and without good cause to proceed without notice and comment rulemaking, is in violation of the APA.

## PRAYER FOR RELIEF

Wherefore, the Plaintiff States request that this Court enter judgment in their favor and grant the following relief:

a.   Postpone the effective date of the Directive pending judicial review under 5 U.S.C. § 705;

b.   Declare the Directive invalid under 5 U.S.C. § 706(2)(A) & (D);

c.   Preliminarily and permanently enjoin the Defendants and their officers, employees, and agents from applying and enforcing the Directive;

d.   Vacate and set aside the Directive pursuant to 5 U.S.C. § 706(2);

e.   Award Plaintiff States reasonable costs and expenses, including attorneys' fees; and

f.   Award Plaintiff States such other relief as this Court deems just and proper.

Respectfully submitted,

**MAURA HEALEY**
Attorney General
Commonwealth of Massachusetts

*/s/ Abigail B. Taylor*
Abigail B. Taylor
Elizabeth N. Dewar
Katherine B. Dirks
Julie E. Green
Angela R. Brooks (admission pending)
Andrew J. Haile
Abrisham Eshghi
Assistant Attorneys General
Office of the Attorney General
One Ashburton Place
Boston, MA  02108
Tel. (617) 727-2200
abigail.taylor@mass.gov
bessie.dewar@mass.gov
katherine.dirks@mass.gov
julie.green@mass.gov
angela.brooks@mass.gov
andrew.haile@mass.gov
abrisham.eshghi@mass.gov

**PHILIP J. WEISER**
Attorney General
State of Colorado

*/s/ Eric Olson*
Eric R. Olson*
Solicitor General
Jacquelynn N. Rich Fredericks*
First Assistant Attorney General
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, Colorado 80203
eric.olson@coag.gov
jacquelynn.richfredericks@coag.gov

**WILLIAM TONG**
Attorney General
State of Connecticut

*/s/ Joshua Perry*
Joshua Perry*
Special Counsel for Civil Rights
Office of the Attorney General
165 Capitol Avenue
Hartford, Connecticut 06106
joshua.perry@ct.gov

31

**KATHLEEN JENNINGS**
Attorney General
State of Delaware

*/s/ Christian Wright*
Christian Douglas Wright*
Director of Impact Litigation
Vanessa L. Kassab*
Deputy Attorney General
Delaware Department of Justice
820 N. French Street, 5th Floor
Wilmington, Delaware 19801
christian.wright@delaware.gov
vanessa.kassab@delaware.gov

**KARL A. RACINE**
Attorney General
District of Columbia

*/s/ Kathleen Konopka*
Kathleen Konopka*
Deputy Attorney General, Public Advocacy
Division
Brendan B. Downes*
Nicole Hill*
Assistant Attorneys General, Public Advocacy
Division
Office of the Attorney General for the District
of Columbia
441 4th St., N.W. Suite 630S
Washington, DC 20001
Kathleen.Konopka@dc.gov

**KWAME RAOUL**
Attorney General
State of Illinois

*/s/ Kathryn Hunt Muse*
Kathryn Hunt Muse*
Deputy Chief, Public Interest Division
Joseph Sanders*
Supervising Attorney, Consumer Fraud Bureau
Elizabeth Morris*
Assistant Attorney General, Special Litigation
Bureau
Office of the Illinois Attorney General
100 West Randolph Street, 11th Floor
Chicago, Illinois 60601
Tel. (312) 814-3000
kmuse@atg.state.il.us
jsanders@atg.state.il.us
emorris@atg.state.il.us

**BRIAN E. FROSH**
Attorney General
State of Maryland

*/s/ Steven M. Sullivan*
Steven M. Sullivan*
Solicitor General
Katherine Bainbridge*
Jeffrey P. Dunlap*
Assistant Attorneys General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
Tel. (410) 576-6427
ssullivan@oag.state.md.us

**DANA NESSEL**
Attorney General
State of Michigan

/s/ *Fadwa A. Hammoud*
Fadwa A. Hammoud*
Solicitor General
Toni L. Harris*
Assistant Attorneys General
Michigan Department of Attorney General
P.O. Box 30758
Lansing, Michigan 48909
Tel. (517) 335-7603
HammoudF1@michigan.gov
Harrist19@michigan.gov

**KEITH ELLISON**
Attorney General
State of Minnesota

*/s/ Tom Madison*
Tom Madison*
Assistant Attorney General
Office of the Minnesota Attorney General
445 Minnesota Street
Suite 900
St. Paul, Minnesota 55101
Tel. (651) 757-1301
thomas.madison@ag.state.mn.us

**AARON D. FORD**
Attorney General
State of Nevada

*/s/ Heidi Parry Stern*
Heidi Parry Stern*
Solicitor General
Office of the Nevada Attorney General
555 E. Washington Ave., Ste. 3900
Las Vegas, Nevada 89101
HStern@ag.nv.gov

**GURBIR S. GREWAL**
Attorney General
State of New Jersey

*/s/ Elspeth L. Faiman Hans*
Elspeth Faiman Hans*
Deputy Attorney General
R.J. Hughes Justice Complex
25 Market Street, P.O. Box 112
Trenton, New Jersey 08625
Tel. (609) 376-2752
elspeth.hans@law.njoag.gov

**HECTOR BALDERAS**
Attorney General
State of New Mexico

*/s/ Tania Maestas*
Tania Maestas*
Chief Deputy Attorney General
PO Drawer 1508
Santa Fe, New Mexico 87504-1508
tmaestas@nmag.gov

**ELLEN F. ROSENBLUM**
Attorney General
State of Oregon

*/s/ Heather J. Van Meter*
Heather J. Van Meter*
Assistant Attorney General
Oregon Department of Justice
1162 Court Street NE
Salem, Oregon 97301
Tel. (503) 947-4700
Heather.j.vanmeter@doj.state.or.us

**JOSH SHAPIRO**
Attorney General
Commonwealth of Pennsylvania

*/s/ Michael J. Fischer*
Michael J. Fischer*
Chief Deputy Attorney General
Pennsylvania Office of Attorney General
1600 Arch St., Suite 300
Philadelphia, Pennsylvania 19103
mfischer@attorneygeneral.gov

**PETER F. NERONHA**
Attorney General
State of Rhode Island

*/s/ Shannon Haibon*
Shannon L. Haibon*
Special Assistant Attorney General
150 South Main Street
Providence, Rhode Island 02903
shaibon@riag.ri.gov

**THOMAS J. DONOVAN, JR.**
Attorney General
State of Vermont

*/s/ Benjamin Battles*
Benjamin D. Battles*
Solicitor General
Julio A. Thompson*
Assistant Attorney General, Civil Rights Unit
Office of the Vermont Attorney General
109 State Street
Montpelier, Vermont 05609
benjamin.battles@vermont.gov
julio.thompson@vermont.gov

**MARK HERRING**
Attorney General
Commonwealth of Virginia

*/s/ Jessica Samuels*
Jessica Merry Samuels*
Assistant Solicitor General
Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
Tel. (804) 786-6835
solicitorgeneral@oag.state.va.us

**JOSH KAUL**
Attorney General
State of Wisconsin

*/s/ Anne Bensky*
Anne M. Bensky*
Assistant Attorney General
State of Wisconsin Department of Justice
Division of Legal Services
17 W. Main Street
Madison, Wisconsin 53707-7857
benskyam@doj.state.wi.us
Tel. (608) 264-9451


*\*Pro hac vice* motions will be forthcoming.