## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| COMMONWEALTH OF MASSACHUSETTS, STATE OF COLORADO, STATE OF CONNECTICUT, STATE OF DELAWARE, DISTRICT OF COLUMBIA, STATE OF ILLINOIS, STATE OF MARYLAND, STATE OF MICHIGAN, STATE OF MINNESOTA, STATE OF NEVADA, STATE OF NEW JERSEY, STATE OF NEW MEXICO, STATE OF OREGON, COMMONWEALTH OF PENNSYLVANIA, STATE OF RHODE ISLAND, STATE OF VERMONT, COMMONWEALTH OF VIRGINIA, and STATE OF WISCONSIN,<br><br>*Plaintiffs*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY; CHAD F. WOLF, in his official capacity as Acting Secretary of Homeland Security; U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT; and MATTHEW T. ALBENCE, in his official capacity as Acting Director of U.S. Immigration and Customs Enforcement,<br><br>*Defendants*. | Civil Action No. 20-11311 |

## PLAINTIFF STATES' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR MOTION FOR
## A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

This Court should enter a temporary restraining order and preliminary injunction

pursuant to Rule 65. Mindful of the extraordinarily short time period this Court has to consider

the merits of preliminary relief due to the July 15, 2020 deadline set by the Defendants in their

July 6, 2020 Directive, the Plaintiff States will not burden this Court with repetitive briefing and

hereby adopt and incorporate by reference the memorandum of law filed by Harvard College and the Massachusetts Institute of Technology in support of a temporary restraining order and preliminary injunction, No. 20-11283, ECF No. 5 (July 8, 2020) ("Harvard & MIT PI Mem."). In short, the States are likely to succeed on the merits of their claims that the Directive was arbitrary and capricious, because it failed to offer a reason for its reversal of prior policy, *id.* at 13-15; failed to consider the substantial reliance interests of universities and foreign students and the harms this abrupt reversal will cause, *id.* at 9-13; failed to consider—or outright disregarded— the evidence that the COVID-19 emergency is continuing unabated, *id.* at 14; and required immediate compliance without affording schools and their students sufficient time to alter plans made in reliance on prior policy, *id*. at 10-11. Moreover, the Directive was adopted without proper procedure. *Id.* at 16-17. Schools and students across the country will suffer irreparable harms akin to those of Harvard College and MIT without the requested injunction, and the balance of harms as well as the public interest both powerfully favor granting the injunction. *Id.* at 17-20.

Plaintiff States respectfully submit this short further memorandum of law to (1) succinctly outline the manifest irreparable harms faced by the Plaintiff States that are set forth at greater length in the accompanying declarations, and (2) address why, in the particular circumstances of this case, it is appropriate for the Court to issue preliminary relief in the form of vacating the Directive in its entirety. Vacating the Directive in its entirety is essential to preserve uniformity in national immigration policy and accords with the remedies Congress itself has set forth to redress such violations in the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 705, 706(2). And only vacating the rule in its entirety would afford the States and District complete

interim relief from the irreparable harms they face, and avoid the confusion and uncertainty that would inevitably arise from a patchwork immigration regime.

## I.    Plaintiff States Will Suffer Irreparable Harm in the Absence of Preliminary Relief Vacating the Rule.

Plaintiff States agree that the requirement of showing an injury that "cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy" is readily satisfied in this case. Harvard & MIT PI Mem. 17 (quoting *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005)). In support of our own request for preliminary relief, and to further apprise the Court of the vast harms the Defendants' arbitrary and capricious actions will cause across the country, Plaintiff States offer this summary of the irreparable harms we face, as described in greater detail in the attached declarations. In short, in directly regulating our public colleges and universities, the July 6 Directive will impose significant financial costs and administrative burdens, and will make it more difficult for them to ensure the safety of their students, faculty, staff, and the untold additional number of state residents with whom members of our school communities live and interact daily. The Directive will also hamper Plaintiff States' ability to regulate schools' response to the epidemic in our States and irreparably harm the public health and economy in our States, to which our more than 373,000 collective international students contributed more than $14 billion in 2019.[1]

***Harm to Proprietary Interests***

---

[1] Institute of International Education Data By State Fact Sheet, *available at* https://www.iie.org/Research-and-Insights/Open-Doors/Fact-Sheets-and-Infographics/Data-by-State-Fact-Sheets (collecting information on international exchange for each state in 2019).

The July 6 Directive directly regulates and imposes immense and irreparable costs and burdens on Plaintiff States' public colleges and universities—costs and burdens ultimately borne by Plaintiff States.

*Costs of increasing in-person instruction.* To retain all international students despite the Directive, our colleges and universities would have to substantially reevaluate the carefully calibrated plans they have developed for the fall semester[2] and instead develop and implement new, complex, and costly accommodations to meet ICE's requirements.[3] Developing unanticipated fall 2020 plans that would expand the availability of in-person instruction poses enormous burdens on schools, including staffing, additional COVID-19 testing, personal protective equipment sourcing, classroom space, class size assignments and reorganization, and

---

[2] *See, e.g.*, Exh. 26, U. Mass. Decl. ¶¶ 12-17 (detailing University of Massachusetts' planning efforts, including, among other things, facilities, public safety, transportation, contact tracing, testing, special accommodations for essential research to be done in person, budgeting, graduated levels of remote learning based on each campus's and each program's circumstances, alternative academic calendar, commuting students with vulnerable family members, vulnerable faculty members); Exh. 1, Conn. Coll. & Univ. Decl. ¶¶ 9-13; Exh. 2, UConn. Decl. ¶¶ 11-15; Exh. 4, Chi. St. Univ. Decl. ¶¶ 18-23; Exh. 5, DePaul Decl. ¶¶ 14-16; Exh. 13, Sch. of Art Inst. of Chi. Decl. ¶ 11; Exh. 19, Univ. System of Maryland Decl. ¶ 13; Exh. 20, Ass'n of Indep. Colls. & Univs. in Mass. Decl. ¶ 6; Exh. 21, Boston Univ. ¶¶ 11-13; Exh. 23, Mass. Ass'n of Cmty. Colls. Decl. ¶¶ 16-17; Exh. 24, Mass. State Univs. Council of Presidents Decl. ¶ 18; Exh. 25, Ne. Univ. Decl. ¶¶ 13-17; Exh. 27, Minn. State System Decl. ¶ 15; Exh. 31, Tufts Univ. Decl. ¶¶ 17-23.

[3] *See, e.g.*, Exh. 26, U. Mass. Decl. ¶ 22 (listing necessary "adjustments in transportation services, cleaning regimes, campus signage, public safety, and myriad other changes," all "at a time when execution is made more difficult since all staff are working remotely"); *id.* ¶ 47 ("It is hard to overestimate how burdensome this will be at such a late date; curriculum is generally set by April of the prior academic year."); Exh. 3, Yale Decl. ¶ 15; Exh. 9, Loyola Univ. Chi. Decl. ¶¶ 23-24; Exh. 21, Boston Univ. ¶ 14; Exh. 23, Mass. Ass'n of Cmty. Colls. Decl. ¶¶ 16, 18; Exh. 24, Mass. State Univs. Council of Presidents Decl. ¶ 20; Exh. 25, Ne. Univ. Decl. ¶¶ 11, 18; Exh. 27, Minn. State System Decl. ¶¶ 18-19.

instructor assignments.[4] All of this would occur in an economic environment where universities already "envisioned a catastrophic level of revenue loss" in their pandemic-adjusted budgeting that is now unexpectedly "compounded by the potential loss of our international students."[5]

*Costs of losing international students.* If schools do not alter plans to limit in-person instruction, they risk losing significant numbers of international students. Students may well transfer or disenroll from school because of their inability to obtain a visa and live in the United States based on their schools' online instruction plans or the students' intended fall 2020 course load.[6]  These students would no longer pay tuition and housing, dining, and other fees at a time when colleges and universities are already faced with severe financial hardship.[7] This is a

---

[4] *See, e.g.*, Exh. 26, U. Mass. Decl. ¶¶ 19-21 (describing "massive reorganization of our teaching schedules and personnel, registration of students and changes in their programs, and an entirely new operational scheme intended to re-introduce a minimum of 7,200 students back to the physical campus" and reallocation of "thousands of hours of manpower" that would be required); *id.* ¶ 22 (further noting that "[s]upporting hybrid learning above and beyond what we have already planned, in order to implement this new scheme, will generate utility costs at least in the tens of thousands of dollars because our campuses will have to reopen buildings that have been shuttered since March"); Exh. 2, UConn Decl. ¶¶ 23-27; Exh. 23, Mass. Ass'n of Cmty. Colls. Decl. ¶¶ 13-14, 20; Exh. 24, Mass. State Univs. Council of Presidents Decl. ¶ 17; Exh. 27, Minn. State System Decl. ¶ 16; Exh. 38, Walensky Decl. ¶¶ 16-23 (describing the COVID-19 testing and other requirements that must be in place before university campuses can safely allow in-person congregation).

[5] Exh. 26, U. Mass. Decl. ¶¶ 13, 45. *See also, e.g.*, Exh. 1, Conn. St. Coll. & Univ. Decl. ¶ 19 (COVID-related shortfall of $30 million); Exh. 2, UConn Decl. ¶ 28 ($134 million shortfall); Exh. 10, Northeastern St. Univ. (Illinois) Decl. ¶ 11; Exh. 19, Univ. System of Maryland Decl. ¶ 11 ($200 million shortfall); Exh. 24, Mass. State Univs. Council of Presidents Decl. ¶ 12; Exh. 27, Minn. State System Decl. ¶ 19; Exh. 31, Tufts Univ. Decl. ¶ 13.

[6] Exh. 26, U. Mass. Decl. ¶¶ 30, 33 (outlining scenarios that may lead to losing students). *See also, e.g.*, Exh. 6, E. Ill. Univ. Decl. ¶¶ 11-13; Exh. 14, S. Ill. Univ. Carbondale Decl. ¶¶ 11-14; Exh. 21, Boston Univ. ¶ 15; Exh. 23, Mass. Ass'n of Cmty. Colls. Decl. ¶¶ 10-12, 14; Exh. 24, Mass. State Univs. Council of Presidents Decl. ¶ 13; Exh. 27, Minn. State System Decl. ¶ 11; Exh. 31, Tufts Univ. Decl. ¶¶ 11, 24; Exh. 39, Univ. of Dist. Columb. ¶ 6.

[7] *See* Exh. 26, U. Mass. Decl. ¶¶ 45, 46. *See also, e.g.*, Exh. 6, E. Ill. Univ. Decl. ¶¶ 12-13; Exh. 17, Univ. of Ill. System Decl. ¶ 16; Exh. 20, Ass'n of Indep. Colls. & Univs. in Mass. Decl. ¶ 10;

particularly acute loss because international students often pay higher out-of-state tuition rates, which enhances public universities' ability to serve lower-income in-state students by reducing the amount of tuition they are required to pay.[8] Even where it is feasible for students to depart to their home countries to pursue online studies, our colleges and universities will still unexpectedly lose housing, dining, and other fees paid by these students; the students' in-person participation in research and other on-campus activities that are not formally part of their course of study; and the students' unique in-person contributions to the fabric of college and university life. And whether students leave the country to study remotely or disenroll altogether, both the schools and the students will likely lose the financial and other benefits of their ability to work as employees on our campuses.[9]

*Costs to our institutions' educational missions.* The July 6 Directive will also cause multifaceted harm to schools' academic, extracurricular, and cultural communities and their overall missions—both as a result of diminishment of international student enrollment, and also with respect to students who remain enrolled but are forced to move abroad. International

---

Exh. 24, Mass. State Univs. Council of Presidents Decl. ¶¶ 14-16; Exh. 27, Minn. State System Decl. ¶¶ 13, 14; Exh. 30, Rutgers Decl. ¶ 14; Exh. 31, Tufts Univ. Decl. ¶ 12; Exh. 32, Univ. of Wisc.-Stevens Point Decl. ¶ 10.

[8] *See* Exh. 26, U. Mass. Decl. ¶ 44; Exh. 2, UConn Decl. ¶ 29; Exh. 6, E. Ill. Univ. Decl. ¶ 13; Exh. 7, Governors St. Univ. Decl. ¶¶ 12-13; Exh. 15, S. Ill. Univ. Edwardsville Decl. ¶ 14; Exh. 17, Univ. of Ill. System Decl. ¶ 17; Exh. 23, Mass. Ass'n of Cmty. Colls. Decl. ¶ 28; Exh. 24, Mass. State Univs. Council of Presidents Decl. ¶ 12; Exh. 27, Minn. State System Decl. ¶ 14; Exh. 33, Univ. of Wisc.-Stout Decl. ¶ 8.

[9] *See* Exh. 26, U. Mass. Decl. ¶ 5 (noting, for example, that at the University of Massachusetts Medical School, 30% of its Biomedical Sciences Ph.D. students international students, who are "active contributors to the research labs on the forefront of solving the COVID-19 crisis, not to mention the thousands of other bio-medical problems to which they apply their talents"). *See also, e.g.*, *id.* ¶ 50; Exh. 15, S. Ill. Univ. Edwardsville Decl. ¶¶ 16, 23; Exh, 25, Ne. Univ. Decl. ¶ 22; Exh. 30, Rutgers Decl. ¶ 18.

students bring rich and diverse viewpoints, interests, and skillsets, which they share in

classrooms, research projects, on-campus jobs, clubs, and other extracurricular activities, as well

as in everyday social interactions with other students, faculty, and staff. If they are forced to

disenroll or leave campus because of the July 6 Directive, schools and other students will lose

contributions of many kinds from them.[10]

*Administrative costs.* Our colleges and universities will also be forced to expend time and

resources to make individualized determinations to certify students with F-1 and M-1 visas and

re-issue I-20s for each student.[11] The July 6 Directive requires institutions adopting a hybrid

model to certify by August 4, 2020, as to each F-1 and M-1 visa holder, that the student is not

taking an entirely online course load and that the student is taking the minimum number of

online classes required to make normal progress in their degree program. For many institutions,

making such certifications for every single student may not even be possible to achieve by the

August 4 deadline.[12] These certifications require not only a determination of the particular forms

---

[10] *See, e.g.*, Exh. 26, U. Mass. Decl. ¶¶ 35-39 (elaborating on harms, including from loss of diversity; reduced learning in experimental fields; and teaching, instructional, and research support provided by international students); Exh. 8, Ill. St. Univ. Decl. ¶ 29; Exh. 11, N. Ill. Univ. Decl. ¶ 10; Exh. 13, Sch. of Art Inst. of Chi. Decl. ¶ 12; Exh. 16, Univ. of Chi. Decl. ¶ 9; Exh. 20, Ass'n of Indep. Colls. & Univs. in Mass. Decl. ¶ 10; Exh. 21, Boston Univ. ¶ 15; Exh. 23, Mass. Ass'n of Cmty. Colls. Decl. ¶ 23; Exh. 24, Mass. State Univs. Council of Presidents Decl. ¶ 22; Exh, 25, Ne. Univ. Decl. ¶ 22; Exh. 27, Minn. State System Decl. ¶ 12; Exh. 28, New Mexico Inst. of Mining Decl. ¶ 10; Exh. 39, Univ. of Dist. Columb. ¶ 15.

[11] *See* Exh. 26, U. Mass. Decl. ¶¶ 23-26 (describing challenges of this process, particularly amidst pandemic). *See also, e.g.*, Exh. 4, Chi. St. Univ. Decl. ¶¶ 25-27; Exh. 21, Boston Univ. ¶ 14; Exh. 23, Mass. Ass'n of Cmty. Colls. Decl. ¶¶ 19-20; Exh. 24, Mass. State Univs. Council of Presidents Decl. ¶ 20; Exh, 25, Ne. Univ. Decl. ¶ 18; Exh. 27, Minn. State System Decl. ¶¶ 18-19; Exh. 28, New Mexico Inst. of Mining Decl. ¶ 11; Exh. 31, Tufts Univ. Decl. ¶ 25; Exh. 32, Univ. of Wisc.-Stevens Point Decl. ¶ 14-15.

[12] *See, e.g.*, Exh. 26, U. Mass. Decl. ¶ 20 (noting that determining which new on-campus courses to create for all international students "in thousands of individualized programs," and who needs

of instruction offered by the schools in which each student is enrolled, but also a determination of each individual student's course load and the format in which such courses will be taught— the latter of which may not be information readily available to the school administration.[13] In some cases, instructors may be given the option to include in-person components, and those decisions may not yet have been made.[14] In other cases, students will not have registered for their courses before SEVP's certification deadline, putting schools in the impossible position of having to certify students before they determine their courses.[15] And again, all of this would have to occur amidst the pandemic, when many employees are working remotely, and some are furloughed.[16]

### Harm to Sovereign Interests

The July 6 Directive will irreparably harm the Plaintiff States' sovereign interest in regulating their public colleges and universities to ensure public health and safety amidst the pandemic. Plaintiff States have issued guidance and mandates governing the reopening of colleges and universities.[17] These include, for example, Massachusetts' requirements that

those courses, is "perhaps not possible for all students"); Exh. 8, Ill. St. Univ. Decl. ¶¶ 26-27; Exh. 12, Northwestern Decl. ¶ 11; Exh. 21, Boston Univ. ¶ 14; Exh, 25, Ne. Univ. Decl. ¶ 18; Exh. 27, Minn. State System Decl. ¶ 19; Exh. 34, Univ. of Wisc-Milwaukee Decl. ¶ 13.

[13] *See, e.g.*, Exh. 26, U. Mass. Decl. ¶ 23; Exh. 14, S. Ill. Univ. Carbondale Decl. ¶ 24; Exh. 15, S. Ill. Univ. Edwardsville Decl. ¶ 22; Exh. 36, Univ. of Vt. Decl. ¶ 13.

[14] *See, e.g.*, Exh. 26, U. Mass. Decl. ¶ 23; Exh. 15, S. Ill. Univ. Edwardsville Decl. ¶ 24.

[15] *See, e.g.*, Exh. 26, U. Mass. Decl. ¶ 23; Exh. 7, Governors St. Univ. Decl. ¶ 17.

[16] *See, e.g.*, Exh. 26, U. Mass. Decl. ¶ 25; Exh. 8, Ill. St. Univ. Decl. ¶¶ 26-27; Exh. 27, Minn. State System Decl. ¶ 19.

[17] *See, e.g.*, https://www.mass.gov/info-details/reopening-mandatory-safety-standards-for-workplaces#overview-; Exh. 2, UConn Decl. ¶ 11 (noting Gov. Lamont's "Reopening Task

institutions of higher education develop a written control plan outlining how each of their campuses will comply with the workplace safety mandates, including rules relating to social distancing, hygiene protocols, and cleaning and disinfecting.[18] The July 6 Directive interferes with implementation of such state guidance and mandates, because it has the effect of coercing schools to consider greater use of in-person instruction, lest they lose their international students.

The July 6 Directive also threatens to reduce Plaintiff States' flexibility in responding to changing conditions over the course of the pandemic. If pandemic conditions worsen, warranting further reduction or elimination of in-person instruction at schools not yet entirely online, the July 6 Directive will serve as a deterrent to making necessary changes as rapidly as possible and will impose additional costs—human, administrative, and pecuniary—in doing so.[19] Coercing schools into holding more in-person classes in the fall[20]—regardless of the schools' assessment of the health and safety risks of doing so—harms the Plaintiff States' ability to regulate their institutions and protect the public.

***Harm to Quasi-Sovereign Interests***

---

Force"); Exh. 17, Univ. of Ill. System Decl. ¶ 7 (noting Gov. Pritzker's "Restore Illinois" plan); Exh. 27, Minn. State System Decl. ¶ 15.

[18] https://www.mass.gov/doc/higher-education-covid-19-control-plan-template/download.

[19] *See, e.g.*, Exh. 26, U. Mass. Decl. ¶ 29 (noting that, if cases should rise in Massachusetts, UMass would "have to be able to disband the campuses and send students away into a fully remote modality," and that, without exemptions, "then our University and our students would face the same uncertainty and damage they do now, again and on a massive scale"); Exh. 2, UConn Decl. ¶ 25; Exh. 5, DePaul Decl. ¶ 18; Exh. 24, Mass. State Univs. Council of Presidents Decl. ¶¶ 20-21; Exh. 30, Rutgers Decl. ¶ 21.

[20] In public statements, the Administration has expressly acknowledged the pressure the July 6 Directive places on schools to reopen. *See, e.g.*, Interview with Acting Deputy Secretary of Homeland Security Kenneth T. Cuccinelli, CNN (July 7, 2020), https://twitter.com/CNNPolitics/status/1280576267360886784 (directive would "encourage schools to reopen"); Donald J. Trump, Twitter, July 6, 2020 ("SCHOOLS MUST OPEN IN THE FALL!!!"), https://twitter.com/realDonaldTrump/status/1280209946085339136.

The July 6 Directive also threatens irreparable injury to the Plaintiff States' interests in the health and well-being, both physical and economic, of our residents. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel Barez*, 458 U.S. 592, 607 (1982) ("[A] State has a quasi-sovereign interest in the health and well-being—both physical and economic—of its residents in general.").

*Health.* The July 6 Directive gravely undermines our States' interest in preserving the health of our residents against the scourge of COVID-19. To avoid the loss of their international students, schools may be compelled to expand in-person classroom instruction beyond that which will best prevent and mitigate the spread of the disease, thus increasing the risk of infection to students, faculty, and staff; to the members of their households; and to the communities in which they live.[21]

*Economic welfare.* For reasons closely tied to, but going beyond, the proprietary reasons described above, the July 6 Directive also threatens the economic welfare of our residents by preventing thousands of international students, and discouraging many others, from coming to and residing in our States to attend both public and private institutions of higher education, amidst what is rapidly becoming not only a national health crisis but also an economic crisis in

---

[21] Exh. 38, Walensky Decl. ¶¶ 24-26. *See also, e.g.*, Exh. 26, U. Mass. Decl. ¶ 28 ("Supporting hybrid learning above and beyond what we have already planned will also increase the level of health risk on our campus, as a result of welcoming more students, faculty and staff back to campus. The potential costs of this increased risk are incalculable."); Exh. 21, Boston Univ. ¶ 13 (explaining that the flexibility of the "Learn *from* Anywhere" plan, which allows the school to present "the same academic content to students, whether they are in a classroom, a BU dormitory, or another location," is "in the best interest of the public health of the City of Boston and surrounding communities"); Exh. 23, Mass. Ass'n of Cmty. Colls. Decl. ¶¶ 24-25; Exh. 24, Mass. State Univs. Council of Presidents Decl. ¶¶ 23-24; Exh. 35, Columbia Coll. - Chi. Decl. ¶ 22.

many parts of the country.[22] The students themselves would bear tremendous costs of many

kinds if forced to relocate.[23] But these students also contribute in excess of $14 billion to

Plaintiff States' economies.[24] Students who work on campus and those with CPT and OPT

visas—opportunities made available to them because of their F-1 or M-1 status, and at risk if

students are forced to leave or cannot enter the country—contribute to our state economies by the

thousands through their employment in fields such as science, technology, biotechnology,

healthcare, business and finance, and education.[25] And, of course, international students also rent

apartments and houses from local landlords; purchase food from grocery stores and restaurants;

frequent our retail stores; and make entertainment and leisure purchases. During the 2018-2019

academic year, international students studying at U.S. colleges and universities contributed $41

---

[22] *See, e.g.*, Exh. 26, U. Mass. Decl. ¶ 52 (highlighting area in western Massachusetts home to 7,800 international students who contribute  $289 million to the local economy and support nearly 3,700 jobs; "[a] precipitous loss of international students would be very damaging to Western Massachusetts at a time of severe economic disruption caused by the pandemic"); Exh. 22, Grtr. Boston Chamb. of Comm. ¶ 5 (citing international students' annual contributions of $3.2 billion to the Massachusetts economy); Exh. 23, Mass. Ass'n of Cmty. Colls. Decl. ¶ 29; Exh. 29, Oregon High. Ed. Coordinating Comm. Decl. ¶ 14 (noting that "the proposed ICE rule change will directly lead to loss of over 2,800 living-wage jobs" in Oregon).

[23] *See, e.g.*, Exh. 26, U. Mass. Decl. ¶ 43 (estimating costs of students unable to continue study as the result of the July 6 Directive); Exh. 18, W. Ill. Univ. Decl. ¶ 29; Exh. 20, Ass'n of Indep. Colls. & Univs. in Mass. Decl. ¶ 9; Exh. 23, Mass. Ass'n of Cmty. Colls. Decl. ¶ 26; Exh. 24, Mass. State Univs. Council of Presidents Decl. ¶ 25; Exh, 25, Ne. Univ. Decl. ¶¶ 20-21.

[24] Exh. 17, Univ. of Ill. System Decl. ¶ 16 (noting expected financial hit to Illinois economy if rule goes into effect); Exh. 37, Univ. of Wisc.-Madison Decl. ¶ 13 (noting financial benefits of international students to Wisconsin).

[25] Exh. 26, U. Mass. Decl. ¶ 42 (noting that the annualized full-time salary that is given up by international students who are participating in an OPT program would most likely total over $77 million"); Exh. 18, W. Ill. Univ. Decl. ¶ 30; Exh. 21, Boston Univ. ¶ 6; Exh. 22, Grtr. Boston Chamb. of Comm. ¶ 7; Exh. 23, Mass. Ass'n of Cmty. Colls. Decl. ¶ 27; Exh. 24, Mass. State Univs. Council of Presidents Decl. ¶ 26; Exh. 30, Rutgers Decl. ¶¶ 31-33.

billion and supported 458,290 jobs in the U.S. economy.[26] In Massachusetts alone, the 2019

economic impact of what was then approximately 71,000 international students was estimated as

$3.2 billion.[27] A loss of international students would damage local economies at a time of

already severe economic disruption caused by the pandemic.

**II.     Vacating the Directive in Its Entirety Is the Appropriate Remedy.**

      **A.     Vacating Invalid Agency Action in Its Entirety Is Both Appropriate to the Legal Violation and Necessary to Preserve National Uniformity in Immigration Policy.**

The July 6 Directive should be vacated in its entirety because this relief is both

appropriate to the nature of the legal violation and vital to preserve uniformity in national

immigration policy.

"[N]ationwide injunctions are especially appropriate in the immigration context" because

of the need for a uniform national immigration policy. *Int'l Refugee Assistance Project v. Trump*,

857 F.3d 554, 605 (4th Cir.), *vacated on other grounds and remanded sub nom. Trump v. Int'l*

*Refugee Assistance*, 138 S. Ct. 353 (2017); *Texas v. United States*, 809 F.3d 134, 187-88 (5th

Cir. 2015), *aff'd by equally divided Court*, 136 S. Ct. 2271, 2272 (2016). As the Fifth Circuit has

observed, the Constitution requires "an uniform Rule of Naturalization," *id.* (quoting U.S. Const.

art. I, § 8, cl. 4), and Congress has instructed that our immigration laws be enforced "uniformly,"

*id.* (quoting Immigration Reform and Control Act of 1986, Pub. L. No. 99–603, § 115(1), 100

Stat. 3359, 3384). The Supreme Court too has described immigration policy as "a comprehensive

and unified system." *Arizona v. United States*, 567 U.S. 387, 401-02 (2012).

---

[26] NAFSA Economic Value Statistics, *available at* https://www.nafsa.org/policy-and-advocacy/policy-resources/nafsa-international-student-economic-value-tool-v2.

[27] *Id.*

Thus, in the immigration context, courts have refused to geographically limit the scope of injunctive relief, where to do so would result in "fragmented immigration policy [that] would run afoul of the constitutional and statutory requirement for uniform immigration law and policy." *Hawaii v. Trump*, 859 F.3d 741, 787 (9th Cir.) (per curiam), *vacated on other grounds*, 138 S. Ct. 377 (2017); *Washington v. Trump*, 847 F.3d 1151, 1166-67 (per curiam), *reh'g en banc and vacatur denied*, 858 F.3d 1168 (9th Cir. 2017). And courts have recognized the need for nationally uniform preliminary relief in challenges to nationwide immigration policies. *See, e.g.*, *Hawaii*, 859 F.3d at 787 (injunction prohibiting enforcement of executive travel ban); *Washington*, 847 F.3d at 1166-67 (same); *Int'l Refugee Assistance Project*, 857 F.3d at 605 (same); *Texas*, 809 F.3d at 187-88 (preliminary injunction prohibiting implementation of DAPA program).

Vacating the July 6 Directive in its entirety also accords with Congress's approval of such relief to redress unlawful agency actions, as reflected in the APA, 5 U.S.C. §§ 705, 706(2). Congress expressly authorized district courts to hold agency actions unlawful in their entirety and to prohibit all enforcement or implementation of an agency action. The APA empowers federal courts, prior to review of the lawfulness of a regulation on the merits, to "postpone the effective date of an agency action" pending conclusion of the proceedings, if "necessary to prevent irreparable injury." 5 U.S.C. § 705. Such relief inherently covers all applications of the challenged regulation, not only the application of the regulation to the plaintiffs. The APA also establishes that, upon reaching the merits, federal courts can "set aside" unlawful rules in their entirety, not only as applied to the plaintiffs. 5 U.S.C. § 706(2). Accordingly, it has long been held that "when a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is

13

proscribed." *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989)); *accord Humane Soc'y of United States v. Zinke*, 865 F.3d 585, 614 (D.C. Cir. 2017) ("A common remedy when we find a rule is invalid is to vacate.").

Further, vacating the July 6 Directive in its entirety is particularly appropriate in the circumstances of this case because it revolves around an issue of law that is "not fact-dependent and will not vary from one locality to another." *City of Chicago v. Sessions*, 888 F.3d 272, 290-91 (7th Cir. 2018), *reh'g en banc granted in part, opinion vacated*, No. 17-2991, 2018 WL 4268817 (7th Cir. June 4, 2018), *vacating reh'g decision as moot*, No. 17-2991, 2018 WL 4268814 (7th Cir. Aug. 10, 2018). The arbitrariness and capriciousness of the Directive and its patent disregard for matters of both substance and procedure does not vary across our country. And, notwithstanding the diverse circumstances among the seventeen Plaintiff States and the District of Columbia and our many institutions of higher education, the Directive will impose grievous harms on us all as a result of its unexplained and abrupt change of policy; disregard of the continuing national emergency caused by the pandemic; unexplained casting aside of the reliance schools and students across the country placed on the Defendants' prior accommodation "for the duration of the emergency"; and complete lack of any substantive consideration of or procedural concessions to the States' and schools' need for time to plan and implement measures to protect the health and safety of our communities in this crisis. It cannot stand.

> **B.    Only Vacating the Rule in its Entirety Will Provide Complete Relief to the Plaintiff States and Avoid the Chaos and Uncertainty of a Patchwork of Immigration Regimes.**

In the circumstances of this case, following the ordinary rule that unlawful agency rules should be vacated in their entirety is appropriate not only because of the nature of the legal

violation—an abrupt change to our immigration laws that the Constitution and Congress have decreed should be applied uniformly across the country—but also, relatedly, because such preliminary relief is necessary to afford complete relief for the Plaintiffs. In the absence of such relief, confusion and risk of error would result from a patchwork of different immigration regimes across the country, harming the Plaintiff States and their colleges and universities.

Vacating unlawful agency action in its entirety is particularly warranted in challenges to policies that cross state lines, like immigration policies. As the Ninth Circuit recognized when it affirmed such relief in the travel ban litigation, "even if limiting the geographic scope of the injunction would be desirable, the Government ha[d] not proposed a workable alternative form of the TRO that accounts for the nation's multiple ports of entry and interconnected transit system and that would protect the proprietary interests of the States at issue here while nevertheless applying only within the States' borders." *Washington*, 847 F.3d at 1167; *accord Hawaii*, 859 F.3d at 788. *See also* Amanda Frost, *In Defense of Nationwide Injunctions*, 93 N.Y.U. L. Rev. 1065, 1093 (2018) (discussing need for nationwide relief in cases involving issues that cross state lines, including immigration, clean air and water, tainted food, and defective products); *see also*, *e.g.*, *In re E.P.A.*, 803 F.3d 804, 808 (6th Cir. 2015) (nationwide injunction of Clean Water Act regulation previously enjoined in only 13 states was appropriate, "consistent with Congress's stated purpose of establishing a national policy," to "restore uniformity of regulation under the familiar, if imperfect, pre-Rule regime"), *abrogated on other grounds by Nat'l Ass'n of Manuf. v. Dep't of Defense*, 138 S. Ct. 617 (2018).

These principles resound in the circumstances of this case, where enjoining the July 6 Directive in its entirety is necessary to give complete relief to Plaintiff States for at least three practical reasons. First, the Directive has thrown colleges and universities across the country into

confusion—and our students and prospective students as well. As outlined above, one of the harms to the Plaintiff States and their schools is that many of our more than 373,000 international students may never return to our schools if they are forced to leave the country now or denied entry for the fall semester. If the Court were to issue only a partial injunction, leaving the July 6 Directive in place in many states and rendering our nation's immigration law non-uniform, the state of confusion created by Defendants will continue unabated for many of these students—and so too will harms to Plaintiff States. For example: If students fly into ports of entry in states not covered by the injunction on their way to schools in the Plaintiff States, would the students be admitted into the country? And would they be permitted to pursue CPT or OPT in a state not covered by the preliminary injunction? For prospective students, if they were to consider coming to the United States, should they apply only to schools in a state covered by the injunction, or more broadly? In the absence of complete relief, students will be deterred from choosing to come anywhere in the United States to study—with all the attendant harms to our States and schools described above. *See, e.g.*, Exh. 26, U. Mass. Decl. ¶¶ 32-33 (noting that "uncertainty, unevenness and imprecision in the application of immigration laws have a deterrent effect on students' decisions to come to the United States for higher education").[28]

---

[28] *See also* Exh. 26, U. Mass. Decl. ¶ 32 ("The ability of the University's vast and complex research programs to maintain the excellence for which they are known depend on the ability to attract and recruit top-tier international talent. In many domains, other countries (including Canada, Australia, China and the countries of the European Union) are simultaneously looking to attract the same people. If international students come to believe that their lives with us will be insecure, their ability to realize their investments in higher education unclear, it will not be long before they seek other places to develop their innovations."); Exh. 27, Minn. State System Decl. ¶¶ 11, 19.

Second and relatedly, a patchwork of relief would create hardships for some students and their families that would ultimately have the effect of causing Plaintiff States to lose enrollment and lose out on competitive candidates in the future. For instance, if a graduate student studies in Massachusetts, but her spouse is a student in a neighboring state in which the July 6 Directive applies and cannot obtain an F-1 visa under the July 6 Directive, their family will be separated unless the student in Massachusetts disenrolls and leaves the country. *See* Exh. 26, U. Mass. Decl. ¶ 33.

Third and finally, if relief is not nationwide, the Plaintiff States will lose out on the rich diversity and special skills that international students bring to our country when they stay to work in the United States. A student who cannot continue her course of studies in a state where no preliminary relief is in effect also cannot contribute to the workforce our States, because the avenue for CPT or OPT work authorization would be foreclosed for a student who loses her F-1 visa. *See* 8 C.F.R. § 214.2(f)(10).

"[E]quitable remedies are a special blend of what is necessary, what is fair, and what is workable." *Lemon v. Kurtzman*, 411 U.S. 192, 200 (1973). Here, the only fair and workable preliminary injunction that provides the Plaintiff States with complete relief is to vacate the July 6 Directive in its entirety.

## CONCLUSION

For the foregoing reasons, the Court should issue a temporary restraining order and preliminary injunction enjoining the Defendants from implementing the July 6 directive.

Respectfully submitted,

**MAURA HEALEY**
Attorney General
Commonwealth of Massachusetts

*/s/ Abigail B. Taylor*
Abigail B. Taylor
Elizabeth N. Dewar
Katherine B. Dirks
Julie E. Green
Angela R. Brooks (admission pending)
Andrew J. Haile
Abrisham Eshghi
Assistant Attorneys General
Office of the Attorney General
One Ashburton Place
Boston, MA  02108
Tel. (617) 727-2200
abigail.taylor@mass.gov
bessie.dewar@mass.gov
katherine.dirks@mass.gov
julie.green@mass.gov
angela.brooks@mass.gov
andrew.haile@mass.gov
abrisham.eshghi@mass.gov

Date:   July 13, 2020

**PHILIP J. WEISER**
Attorney General
State of Colorado

*/s/ Eric Olson*
Eric R. Olson*
Solicitor General
Jacquelynn N. Rich Fredericks*
First Assistant Attorney General
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, Colorado 80203
eric.olson@coag.gov
jacquelynn.richfredericks@coag.gov

**WILLIAM TONG**
Attorney General
State of Connecticut

*/s/ Joshua Perry*
Joshua Perry*
Special Counsel for Civil Rights
Office of the Attorney General
165 Capitol Avenue
Hartford, Connecticut 06106
joshua.perry@ct.gov

18

**KATHLEEN JENNINGS**
Attorney General
State of Delaware

*/s/ Christian Wright*
Christian Douglas Wright*
Director of Impact Litigation
Vanessa L. Kassab*
Deputy Attorney General
Delaware Department of Justice
820 N. French Street, 5th Floor
Wilmington, Delaware 19801
christian.wright@delaware.gov
vanessa.kassab@delaware.gov

**KARL A. RACINE**
Attorney General
District of Columbia

*/s/ Kathleen Konopka*
Kathleen Konopka*
Deputy Attorney General, Public Advocacy
Division
Brendan B. Downes*
Nicole Hill*
Assistant Attorneys General, Public
Advocacy Division
Office of the Attorney General for the
District of Columbia
441 4th St., N.W. Suite 630S
Washington, DC 20001
Kathleen.Konopka@dc.gov

**KWAME RAOUL**
Attorney General
State of Illinois

*/s/ Kathryn Hunt Muse*
Kathryn Hunt Muse*
Deputy Chief, Public Interest Division
Joseph Sanders*
Supervising Attorney, Consumer Fraud
Bureau
Elizabeth Morris*
Assistant Attorney General, Special
Litigation Bureau
Office of the Illinois Attorney General
100 West Randolph Street, 11th Floor
Chicago, Illinois 60601
Tel. (312) 814-3000
kmuse@atg.state.il.us
jsanders@atg.state.il.us
emorris@atg.state.il.us

**BRIAN E. FROSH**
Attorney General
State of Maryland

*/s/ Steven M. Sullivan*
Steven M. Sullivan*
Solicitor General
Katherine Bainbridge*
Jeffrey P. Dunlap*
Assistant Attorneys General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
Tel. (410) 576-6427
ssullivan@oag.state.md.us

**DANA NESSEL**
Attorney General
State of Michigan

*/s/ Fadwa A. Hammoud*
Fadwa A. Hammoud*
Solicitor General
Toni L. Harris*
Assistant Attorneys General
Michigan Department of Attorney General
P.O. Box 30758
Lansing, Michigan 48909
Tel. (517) 335-7603
HammoudF1@michigan.gov
Harrist19@michigan.gov

**KEITH ELLISON**
Attorney General
State of Minnesota

*/s/ Tom Madison*
Tom Madison*
Assistant Attorney General
Office of the Minnesota Attorney General
445 Minnesota Street
Suite 900
St. Paul, Minnesota 55101
Tel. (651) 757-1301
thomas.madison@ag.state.mn.us

**AARON D. FORD**
Attorney General
State of Nevada

*/s/ Heidi Parry Stern*
Heidi Parry Stern*
Solicitor General
Office of the Nevada Attorney General
555 E. Washington Ave., Ste. 3900
Las Vegas, Nevada 89101
HStern@ag.nv.gov

**GURBIR S. GREWAL**
Attorney General
State of New Jersey

*/s/ Elspeth L. Faiman Hans*
Elspeth Faiman Hans*
Deputy Atorney General
R.J. Hughs Justice Complex
25 Market Street, P.O. Box 112
Trenton, New Jersey 08625
Tel. (609) 376-2752
elspeth.hans@law.njoag.gov

**HECTOR BALDERAS**
Attorney General
State of New Mexico

*/s/ Tania Maestas*
Tania Maestas*
Chief Deputy Attorney General
PO Drawer 1508
Santa Fe, New Mexico 87504-1508
tmaestas@nmag.gov

**ELLEN F. ROSENBLUM**
Attorney General
State of Oregon

*/s/ Heather J. Van Meter*
Heather J. Van Meter*
Assistant Attorney General
Oregon Department of Justice
1162 Court Street NE
Salem, Oregon 97301
Tel. (503) 947-4700
Heather.j.vanmeter@doj.state.or.us

**JOSH SHAPIRO**
Attorney General
Commonwealth of Pennsylvania

*/s/ Michael J. Fischer*
Michael J. Fischer*
Chief Deputy Attorney General
Pennsylvania Office of Attorney General
1600 Arch St., Suite 300
Philadelphia, Pennsylvania 19103
mfischer@attorneygeneral.gov

**PETER F. NERONHA**
Attorney General
State of Rhode Island

*/s/ Shannon Haibon*
Shannon L. Haibon*
Special Assistant Attorney General
150 South Main Street
Providence, Rhode Island 02903
shaibon@riag.ri.gov

**THOMAS J. DONOVAN, JR.**
Attorney General
State of Vermont

*/s/ Benjamin Battles*
Benjamin D. Battles*
Solicitor General
Julio A. Thompson*
Assistant Attorney General, Civil Rights
Unit
Office of the Vermont Attorney General
109 State Street
Montpelier, Vermont 05609
benjamin.battles@vermont.gov
julio.thompson@vermont.gov

*Pro hac vice* motions will be forthcoming.

**MARK HERRING**
Attorney General
Commonwealth of Virginia

*/s/ Jessica Samuels*
Jessica Merry Samuels*
Assistant Solicitor General
Office of the Attorney General
202 North Ninth Street
Richmond, Virginia 23219
Tel. (804) 786-6835
solicitorgeneral@oag.state.va.us

**JOSH KAUL**
Attorney General
State of Wisconsin

*/s/ Anne Bensky*
Anne M. Bensky*
Assistant Attorney General
State of Wisconsin Department of Justice
Division of Legal Services
17 W. Main Street
Madison, Wisconsin 53707-7857
benskyam@doj.state.wi.us
Tel. (608) 264-9451

## <u>CERTIFICATE OF SERVICE</u>

I, Abigail B. Taylor, counsel for Plaintiffs, hereby certify that this document has been filed through the Court's ECF system and will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF). On July 13, 2020, this document was delivered by hand and by email to:

> United States Attorney for the District of Massachusetts
>   Attn:  Rayford A. Farquhar, Esq.
> United States Attorney's Office
> John Joseph Moakley Federal Courthouse
> 1 Courthouse Way
> Suite 9200
> Boston, MA 02210
> 617-748-3100
> 617-748-3971 (fax)
> rayford.farquhar@usdoj.gov

and was sent by certified mail to the following:

> United States Department of Homeland Security
> 2707 Martin Luther King Jr. Ave., S.E.
> Washington, D.C. 20528

> United States Immigration and Customs Enforcement
> 500 12th St., S.W.
> Washington, D.C. 20536

> The Hon. Chad F. Wolf
> Acting Secretary of Homeland Security
> United States Department of Homeland Security
> 2707 Martin Luther King Jr. Ave., S.E.
> Washington, D.C. 20528

> Matthew Albence
> Acting Director of United States Immigration and Customs Enforcement
> United States Immigration and Customs Enforcement
> 500 12th St., S.W.
> Washington, D.C. 20536

/s/  Abigail B. Taylor
